v. Paxton Thank you, Judge Ho, and may it please the Court. Moody emphasized that state legislatures are better positioned than courts to address emerging challenges in the context of children using social media, and that pre-enforcement facial challenges threaten to usurp the democratic process by preventing duly enacted laws from being implemented in constitutional ways. All nine justices of the Supreme Court agree that pre-enforcement facial challenges are disfavored and difficult to win, and that plaintiffs who choose to bring them have to meet a very high burden, which is mapping all of the statute's potential applications and then showing that unconstitutional applications substantially outweigh constitutional applications. Here because the plaintiffs have not even tried to carry that burden, the panel should reverse, as it did in Net Choice v. Fitch earlier this year. Judges Ho and Higginbotham, I know you were both on the Fitch panel. I think that the problems with the District Court's orders here are very similar. In fact, I think it's telling that the District Court here, in both of its orders, cited the Fitch District Court order before it had been vacated seven or eight times in each order and said that it was effectively doing the same analysis and reaching the same conclusion. And as Your Honor said in your opinion, it's not enough to map some or most of the statute's potential applications. You have to map all of them, and it is a fact-intensive inquiry, and you have to show that the unconstitutional applications substantially outweigh the constitutional applications. And I think that this case really exemplifies the problem with pre-enforcement facial challenges that has led to a sort of rare consensus on the Supreme Court in the First Amendment context. All nine justices of the Court agreed in Moody, which is it's not enough for plaintiffs to seek a pre-enforcement facial injunction and say, all of this applies to protected works of art and literature, it might apply to Romeo and Juliet, it might apply to songs on the radio, Academy Award winning movies, which is the same arguments that the Net Choice plaintiffs made in the Fitch case. That's not enough. And it's not clear what the burden looks like under Moody. I think it's significant that three of the justices wrote separately and said that the burden is effectively impossible to meet. But I think at a minimum, the plaintiffs have to address each application of the statutory language. So the monitoring and filtering provision here has three verbs and 11 nouns. I think at a minimum, they could address each of those combinations and say, is this protected speech with respect to minors, yes or no, what is the level of scrutiny? But they haven't done that. And Judge Ho, I agree with your concurrence in Fitch, and I think we both agree with Justice Thomas's dissent in Brown. But Brown, I don't think, stands for the proposition that the plaintiffs argue here. I think Brown was really a pretty narrow opinion. And what Justice Scalia said is he looked back to Ginsburg and he said, well, we know minors have less First Amendment rights than adults. We know that they don't have right to see what's obscene for minors and anything else that's subject to a legitimate prescription. I think Ginsburg used the language, is this a category of expression that has traditionally been secured to minors? So what Justice Scalia did is he, what he often does, he did a history and tradition analysis looking back to the 18th century, and he said, sure, there is a tradition in this country going back to the 18th century of children being exposed to violence. I don't think that my friends on the other side will be able to identify a similar history and tradition of children being exposed to content that glorifies suicide or promotes sex abuse of children or facilitates child pornography. And so I really think that they didn't do the work in the case, and I think that as in Fitch, the panel should reverse. I don't think vacature and a remand for a proper Moody analysis is as appropriate here as it was in Fitch. Of course, the Fitch District Court didn't have the benefit of the Moody opinion. Here we briefed Moody extensively at the district court level, and the district court effectively did the same analysis. One of the frustrations in the course of this long-running litigation is the case that we jump into the appeals and the arguments and the fine points and take it away from a trial evidence. And one of the most powerful things that could have occurred and it didn't occur is that you have assertions about what we can do and what we can't do, our abilities to control, not control, the technology, those issues. And I've said it in the opinion, but it got ignored, but what could have happened and should have happened is that you just simply go to those four most powerful words a district judge speaks, call your first witness, and you then require that those who would expose children to these, or arguably so, demonstrate the power and effectiveness of their controls, the technological controls. Instead, it gets bypassed, and you've got a bunch of judges talking about technology that they may or may not fully comprehend because it has not been fully explained. So this is more of an observation with regard to procedures. And what I would, what would enhance the whole process would be the requirement that people who would offer these services, I guess, challenges as to its ability to be controlled, demonstrate it and not that we just have brief assertions about those. Simplicity is kind of old-fashioned in trial cases, but, you know, it still remains, in my judgment, who trials have been a lifetime, that that's the most powerful way to resolve these issues. And so there you are. So . . .  No, I totally agree. . .      I agree with the extensive factual finding with respect not only to how the companies can implement the requirements, but also to what the statute, in fact, applies to, which is what, is exactly what you said in Fitch. And I agree that the district court and the plaintiffs effectively ignored the opinion in Fitch on remand. The plaintiffs filed an amended complaint, raised an as-applied challenge, filed a renewed motion for preliminary injunction. The district court gave them the same relief on an as-applied theory. And Mississippi said, hang on a second. You're not complying with the court's mandate in Fitch, so it filed a motion for an emergency stay in this court, and a different panel granted that emergency stay. So I totally agree with you, which is why I don't think another vacate and remand for a Moody analysis is going to work here, because I think that the district court here, unlike in Fitch, had the benefit of Moody. We briefed it extensively, and the district court did not do justice whatsoever to what Moody requires, Your Honor. I completely agree. How do you do a weighing, as required by Moody, as to constitutional versus unconstitutional applications up against a statute that is arguably vague or ambiguous, as I believe your friends on the other side have argued, at least with regard to the monitoring and filtering of the unlawful as-requirements? So I think what it would look like, again, is they would have to apply some sort of analysis. They haven't even tried to tease out the statutory requirements under monitoring and filtering. There is the targeted advertising provision issue, which only the seat plaintiffs challenged. The social media companies themselves have not challenged those. With respect to monitoring and filtering, you would have to say, okay, what's the first requirement? You have to prevent a no-minors exposure to harmful material, which is cross-defined in the statute, which is obscene for children under the penal code, the Texas penal code. We know, going back to Ginsburg, that that's not protected speech with respect to minors. So certainly, that's not subject to strict scrutiny. They're arguing that the entire provision is subject to strict scrutiny. I don't understand that argument. Then we could go to things like facilitating child pornography, facilitating stalking, facilitating harassment. Are those protected speech with respect to minors? They would need to argue yes or no. If they want to argue that they are and that some sort of heightened scrutiny applies, that's fine. And then they can say, well, on balance, I think the substantial majority of the applications of this provision are unconstitutional. And again, there is no incidental speech burden on adults here. So all of the cases cited, Riley, Reno, City of Jacksonville, Sable, those cases all said, look, you can't reduce the First Amendment rights of adults to that which is appropriate for children. You can't require them to scramble cable television for two-thirds of the day. You can't say no nudity at drive-in movie theaters because kids might see it. And even in Free Speech Coalition from earlier this year, Justice Thomas said, there's only intermediate scrutiny when the speech burden on adults is not significant. There was age verification. But here we're talking about social media companies and adults speaking directly to minors. The provision only requires them to adopt a strategy to prevent known minors, so it's users of social media who they know to be under the age of 18, from seeing a certain category of content. And to answer your question, Judge Douglas, I think they would have to tease out whether each application is protected with respect to minors, if so, what is the level of scrutiny, and then they could make some sort of argument. I don't know if substantial majority is 75%, I think that would be reasonable. They could offer some sort of representative sample. Here's how we applied this for 24 hours as we understand it. Here's an appendix of all of the posts of protected speech with respect to minors that we had to take down. I mean, they have to do something. I think it's getting to a point where they're making effectively the same arguments in all of these cases and all of these jurisdictions. And make no mistake, this is not just a Texas issue. All of the states essentially are trying to adopt these laws, California, New York, Mississippi, Texas. And I think some sort of case specific effort, at a minimum, is required under Moody. Now, with respect to standing- Back to your earlier Moody point, I certainly get your argument that if the district court didn't apply Moody, then perhaps we remand so the district court can do that in the first instance. But you went further, right? You're saying we shouldn't send it back because the district court already had the benefit of Moody. I'm not sure I understand that because it happens all the time where the district court hasn't applied the right standard that they knew about. But they misapplied it and we send it back. Why would we not send it back here? Well, I think in Fitch- You're asking us to render and do the analysis. Reverse the facial injunctions, your honor. I think in Fitch it was different because Moody came out at a very late stage. And so the district court didn't have the benefit of it. Here, I think where you have the parties raising the arguments under Moody and the plaintiff is just not even trying to engage with a good faith Moody analysis, much less carry the burden under Moody, I think reversal is appropriate. Of course, if the court wants to vacate and remand for further Moody analysis, that's fine. But as Judge Higginbotham said, I think that's problematic when you have the district court basically just granting the same relief under an as applied theory. And I think it's significant that in their briefs they say the statute is unconstitutional either facially or as applied. They don't apply a different analysis at all. And so I think at least with respect to preliminary injunction, again, trying to facially enjoin the statute before it has become effective, before the Attorney General has ever tried to implement it, it is a high standard. And I think intentionally so. And I think if you look at cases like Williams and Hanson, the Supreme Court does not like trying to address this sort of theoretical exercise of how far can I stretch this statutory language. My goodness, it says child pornography, well that might include teenage sexuality and therefore it might apply to Romeo and Juliet. I mean, it gets hard to take these hypotheticals seriously at a certain point, Your Honor. And Judge Higginbotham, I listened to the Fitch argument. I agree with you, a lot has changed since cases like Reno where there were factual findings by the district court that it was impossible to age verify on the Internet. That it was unlikely that anybody would see nudity accidentally on the Internet. And my favorite quote from the Reno case is that the Internet is not nearly as pervasive as the radio. Well, a lot has changed in the last 30 years, Your Honor. And I think that you're absolutely correct, Judge Higginbotham, that Ginsburg gives states a lot of latitude in this area. It said that states have a transcendent interest in protecting children. And so I think the case, I mean, if you think about Brown, if you imagine that the state statute there has said you can't sell video games that facilitate child pornography. I think Justice Scalia would have done the same analysis and he would have said, well, this isn't Grimm's Fairy Tales, this isn't Snow White. This is categorically different. There is no tradition in this country of minors being secured this sort of expressive activity. I don't think that the statute is a prior restraint. That's another argument that they make. I think it's a lot more akin to the age verification requirements in cases like Ginsburg and Brown, where they say you can carry the girly mag or the video game in your store. You can publish it, you just can't sell it to minors. That's exactly what this statute does. It doesn't prohibit adults from posting anything. It doesn't prohibit anybody from posting anything. They just have to implement a strategy to filter the content only with respect to minors. If this was a prior restraint, I think the laws at issue in Ginsburg and Brown would be prior restraints, but the plaintiffs didn't even make those arguments in those cases. With respect to standing, your honors, I think the standing declarations in the seat case speak for themselves. I think it's telling that you can't get anyone to sign a declaration in this case saying that they want to see or speak in ways that are actually covered by the statute. They say, well, I want to engage in anti-bullying advocacy. There's no argument whatsoever that the statute reaches anti-bullying advocacy or casual discussions about mental health. I mean, I think the distance between what's actually in the standing declarations and what the statute actually covers is pretty telling that the statute really is getting at only the worst of the worst content that's on the Internet. If there's no other questions, I will reserve the- Let me follow up, actually, on what you were saying in terms of what complies with the state statute and what doesn't. It seems to me that there are quite a few questions of statutory interpretation that we have to deal with before properly doing a First Amendment analysis. I'm not saying right now, but on remand or in order to properly understand the constitutional analysis, we need to know what the state law means. What's the state's position on certifying these issues to the Texas Supreme Court? It seems to me we have cases like McKesson and Whole Woman's Health where the Supreme Court has wanted us to certify issues like this. Absolutely, Your Honor. To potentially avoid or at least clarify what the federal constitutional questions are. Yeah, I think that would be fine. I thought about affirmatively bringing up that argument, but we didn't brief it. But I think that certifying the question would be appropriate to the Texas Supreme Court. Okay, thank you. Thank you, you've saved time for rebuttal. Mr. Keller. May it please the court. Scott Keller for CCIA and NetChoice. The district court correctly enjoined HB 18's monitoring and censorship requirements, and these are the only provisions at issue in the appeal in our case discussed today. A base government cannot commandeer private websites to monitor and filter speech on the state's behalf. And it cannot create new categories of unprotected speech. Those are quintessential First Amendment violations. And section 230 also preempts these requirements. Now, I can go through and explain why severability and limiting constructions I don't think work in this context. If I can jump to the facial challenge analysis, as I know there was a lot of discussion about that. At the outset, first of all, we've also raised as applied challenges here, and we provided the evidence, Judge Higginbotham. This is ROA 146 to 148 of our members' policies and how they also have concerns about this speech too. And at the same time, there's evidence in the record, this is ROA 153, that our members over a six month period, just a single six month period, removed almost 6 billion posts of speech. So this is not a case where these websites are burying their heads in the sand. But the problem here is the state, at the threat of thousands of dollars per violation of penalties, has passed a law that is requiring websites to develop and implement a strategy ahead of time that is going to prevent exposure to a list of 11 or 12 categories of speech that are not tethered at all to the historically recognized unprotected speech categories. And so, when we're sitting here talking about some of these examples of is speech promoting suicide or glorifying suicide, does that sweep in Romeo and Juliet? I mean, that's what I was taught in English class. Now, we can have those debates, but the point is that I think the state, when it comes to regulating speech, has to be clear. And now, we can get into the nuances of what these statutory terms mean, and we can talk about the Williams case and the Hansen case. But I think those only help us, and here's why. This law doesn't require men's rail whatsoever. So what do you want this court to do? So what I would like this court to do is affirm the preliminary injunction that the district court issued, including on the facial basis. And I think one basis that the court can do so, without even getting into any of the moody facial challenge issues, is section 230 preemption. I mean, under this court's AB versus Salesforce decision, this is clearly all preempted by 230. The duty that HB 18's monitoring and censorship requirements imposes is to engage in content moderation. It is monitoring and filtering. And the very first sentence of their brief says, this law is all about monitoring and filtering. I thought 230 was about liability for content. It preempts state laws that would treat- Liability for third party content. Liability for third- That's not what we have here. Yes, this law, the coverage provision, this is 509.002, one and two. It's covering digital service providers. About setting up a particular system with certain protections. It's not really about attaching. I mean, maybe it should be preempted. I know there's a lot of discussion about the proper scope of regulation, federal versus state. But in terms of understanding 230, it seems to be outside the scope of 230. No. What this requires is monitoring and filtering. It requires moderating the content that is in these content categories. I mean, the law itself refers to these as trying to prevent harm. And that is tethered to the content, the improper character of the content that the state is saying. And that's the exact basis of common law that you would be treating someone as the publisher. We've cited the Fourth Circuit recognizing that proposition. But if I can point the court to 509.002A, this is the coverage definition. Digital service providers that allow users to socially interact, to create a public or semi-public profile, to post content, sharing content on a message board, a chat room, a landing page, a video channel. A main feed that presents content to a user created and posted by other users. All of this is about users generated speech. That's exactly what 230 preempts. And so I think this is unlawful across the board because it's requiring monitoring and filtering. It's requiring content moderation. I don't think the court has to get to any of the moodier First Amendment issues to do that. Now, I do think we still win under the First Amendment. I think we win under the First Amendment as a facial basis and both as applied. Is there a tension in your arguments, though, between 230 and First Amendment? I mean, First Amendment means you're protecting your own speech. 230 is about being held liable for third party speech. No, Judge Holt. There is no tension. And First Amendment values drive Section 230. I mean, here, First Amendment and 230 aren't coterminous, but yet they do drive in the same direction. And also, too, if I can very clearly take this issue. 230 is about being held liable for somebody else's speech. For user-authored speech. But the website is saying— In other words, not your speech. Whereas the First Amendment claim is based on something being your speech. Well, I don't think that's right, Judge Holt. And I think what Moody recognized is whether you're talking about authoring speech, disseminating speech, or viewing speech, all of it's protected by the First Amendment. Now, what 230 says is if it's user-authored speech and yet the website disseminates it, the website is not liable. But that doesn't mean that the website itself authored the speech. And so that's where I think, you know, the First Amendment protects it both. 230 would protect it if the user generates it and the website disseminates it. And that's exactly what this law is talking about. You have a function as a newspaper. You have essentially a function as a newspaper. It's a big publication. And I think Smith v. California, if I can get into some of the limiting constructions that have been proposed, is a great case for us. Because there's no mens rea in this statute. And even if you were to talk about trying to read in a mens rea, doing kind of like what Williams or Hansen did, think about what those cases were about. That was about saying that there was a specific intent for a single act of illegal immigration or a specific intent for a transaction of a single piece of child pornography to be transferred. And even then, that would be effectively about the mens rea of what we're talking about here, of the user. But we know from Smith v. California that when you're talking about, Judge Higginbotham, this goes to your point, a speech disseminator, you can't just eliminate all mens rea. But that's exactly what this law does. This law does not require any mens rea of any websites. And so when we're talking about moderating content at the scale of millions, if not billions, of posts of speech, the state doesn't get to impose a wide-sweeping dragnet with thousands of dollars per violation and then say, well, we can figure this all out later. The very reason why we had to seek preliminary injunctive relief was because of all the ambiguities that we're talking about here. And Judge Douglas, to your point, too, on the vagueness issue, we absolutely can raise that in a pre-enforcement preliminary injunctive posture. And if the state wants to come back and say that, well, there are limiting constructions on promotes and glorifies, that can be figured out at some point. But what I don't think the state can do, though, is say, well, let's take those limiting constructions, let's impose the mens rea that the users would be doing, but let's leave no mens rea protections for websites, as they're supposed to call through millions of posts of speech. That's not at all how the First Amendment or Section 230 have ever worked. Instead, when you're talking about content-based restrictions of speech, and this is very clearly a content-based restriction of speech, that triggers strict scrutiny. And the state can try to say that this is somehow speech, or it's covering some amount of speech integral to criminal conduct. But even then, you'd have criminal process. You'd have elements of crimes that have to be met, including mens rea. So whether we take it as a prior restraint, whether we take it as a content-based unlawful restriction of speech, or we take it as vague or Section 230, I think any one of those four paths get us to the same result, which is that this law is unconstitutional or preempted. And finally- Do you have a view on whether there are state law issues here that warrant certification? Yeah, I think given the nature of the arguments we've made, I think the law is unconstitutional and preempted regardless. But at the same time, if the state law were to be narrowed in a way that you'd read in all of these mens rea protections, and you then have to discard the news and sports exception that is a different content-based problem with this law. And there's still wildly under-inclusive problems with the law that it doesn't cover other speech mediums where the same speech could occur, like books, TVs, movies, even other websites, streaming services like Hulu. And the fact that there is separate Texas law that criminalizes the underlying conduct, the criminal conduct. We've collected this brief at page 36 to 37. If you put aside all of those issues, I think that's the only way that you'd get to possibly asking, okay, how exactly do you splice these content categories? So I don't think the court has to get there, but at the same time, we're not going to complain if there's more clarity in this statute. But I do think it's still unlawful all the same, especially when we're talking about what are the less restrictive means here? These websites are not burying their heads in the sand. They understand that there are concerns about this speech. They have policies that they do not want to be disseminating these categories of speech. And you would think that in that context, if the state looked at those policies, and these are in the record, it's ROA 146 to 148, and they said, oh, great, I'm glad your members are doing that. Therefore, you, Net Choice and CCIA, don't need a preliminary injunction because your members are already satisfying this law. I mean, that would provide the narrowing, potentially, of the state statute that we need. But instead, they've never said that. That's why we're here. And that's why I think all these limiting constructions are coming up to this court now in this appellate posture, rather than when we were litigating these issues before the district court, when the district court could have been deciding those issues. Also, too, these websites are providing parents many tools to oversee their minor children's online experiences. This is ROA 143 to 146, and we know from the Supreme Court that publicizing that information, or subsidizing that information, is a less restrictive alternative. Instead of having thousands of dollars of penalties, thousands of dollars per violation of penalties, when we're talking about a content-based law that is sweeping in speech beyond the historically recognized categories of unprotected speech. So, even back up to maybe the very starting point of, I think, how the court should address this. This is a content-based speech restriction. That's presumptively unconstitutional. It's the state's burden to then come to this court and explain how that law can possibly be applied in constitutional ways. And even if they can come up with some examples, even if they come up with some discrete examples of speech integral to criminal conduct, that still doesn't fix the problem, that there's no mens rea for the websites, it doesn't fix the 230 preemption problem. And I would submit it does not also fix the problem of the vagueness of what is promoting, what is glorifying, what is facilitating. The undefined verbs, the undefined categories all lead to the same place. The law is facially unconstitutional, it's also, as applied, unconstitutional and preempted to our covered member websites. I'd be happy to address any other questions from the panel. I know there are a lot of issues here in these weighty important First Amendment cases and the facial challenge posture. I would also submit on the facial challenge that this law is not at all in the same situation as this court's Fitch opinion that I identified asking is Google Mail covered, is Microsoft Teams covered, is DraftKings covered? We addressed this in our brief at page eight to nine. This law excludes email. It excludes direct messaging services. It excludes content primarily generated or selected by the website. It excludes services that primarily feature commerce or sports. All of those exclusions mean Google Mail's not covered, Microsoft Teams isn't covered, Google Meet is not covered, ride sharing like Uber, Google Maps, DraftKings, payment services, online marketplaces, ride sharing. None of that is covered by this law. And that's precisely why the district court didn't have to get into that type of analysis. No one was making that argument because it's very clear that the statutory text accepts that. If there are no further questions, we'd ask that you affirm the preliminary injunction in our case. Thank you. Thank you, Mr. Keller. We'll now hear from Mr. Kornrevere, if I pronounced that correctly. Good morning, your honors. May it please the court. I'm Robert Kornrevere, and with my colleague David Gossett from Davis-Wright-Tremaine. We represent the user plaintiffs, including students engaged in Advancing Texas, the Ampersand Group, Brendan Clawson, and the Minor MF. Like CCIA, we challenge the monitoring and filtering provisions of HB 18 section 53. And we agree with the position just articulated by Mr. Keller. But in addition to that, the user plaintiffs challenged the targeted advertising restrictions in sections 52, 2D and sections 55. So I'll start with those. Section 52, 2D prohibits digital services providers from displaying any targeted advertising to known minors without prior parental consent. And section 55 prohibits ads targeted that facilitate, promote, or a product, service, or activity that is unlawful for a minor in Texas to engage in. Both of these provisions are facially invalid. Both do nothing but restrict speech, and both restrict ads that minors have a constitutional right to access. The main argument is that the targeted advertising restrictions violate the key principles articulated by the Supreme Court in Brown versus EMA. First of all, the state lacks a free floating power to restrict ideas to which minors are exposed. And secondly, any restrictions that fall within, must fall within historically recognized exceptions to free speech protection. The harm to minors category cannot be expanded beyond its native area of obscenity. And the state cannot require prior parental consent for communication to or between minors. Now the state has tried to dismiss the application of Brown, saying that it was a narrow opinion. But it's not. It reaffirmed that minors have substantial protection for free speech unless it falls into one of those exceptions. It reaffirmed the prior ruling from the Supreme Court in Erznozik versus City of Jacksonville. This was also, in sort of a backhanded way, affirmed by the Supreme Court recently in FSC versus Paxton. Holding that the exceptions for protections for minors apply only to the area of obscenity. And in that case, because minors don't have access or don't have the right to access certain kinds of information, then it applied intermediate scrutiny to those restrictions. This is nothing like that. This is a direct restriction on speech beyond those categories, and therefore the First Amendment applies. The district court found that this failed First Amendment scrutiny and it enjoined those provisions. And the state does not really engage on the merits. It doesn't disagree with the district court's holding that the state offered no compelling interest for restricting targeting ads in any event, much less on digital service providers. The district court found that these provisions are not limited to commercial speech, as the state maintains. And that the restrictions are under-inclusive, because they allow minors to see targeted ads in other non-covered media. On top of everything else, the restrictions were unconstitutionally vague. As I say, there simply was no defense of the merits of this case. The main argument that the state makes is that these targeted ad restrictions only apply to commercial messages. But that's not the way the statute reads. The sections describe the prohibition as simply applying to advertising. And it doesn't define what advertising means. As my friend from Texas said, where the legislature wants to specify, it cross-references other sections of Texas law. But here, for example, HB 18 specifies that the harmful to minors category is taken from section 43.24 of the penal code. There's no similar cross-reference for commercial advertising. And as we point out- Is that a good reason to certify? Excuse me? Is that a good reason to certify, to see what the Texas Supreme Court says on how the cross-references work, or the lack of cross-references work? No, I think it would only certify if it's readily susceptible to a limited construction. And here, the absence- Certify for any question of statutory interpretation or Texas state law. But either way, the statute would be unconstitutional without rewriting the statute, which would require the inclusion of the word commercial advertising. As we point out in our brief, the standard definition of advertising applies to all promotion and not just commercial promotion, and under Texas law, it refers to advertising in both contexts, if you look at other provisions of Texas law. For example, the Estates Code, section 1356, defines advertising as applying to the sale of goods. But the Texas government code defines advertising as, quote, a communication that supports, opposes, or proposes legislation. Here, the broad definition of advertising, or the unrestricted definition of advertising in the plain meaning of the statute, applies to the very kinds of communications that the seat plaintiffs and appersent group are engaged in. This was illustrated in the various declarations provided in the district court that SEAT specifically targets minors between 13 and 17 on issues of advocacy, legislative efforts, and civic engagement. And SEAT wants to send targeted ads on issues like the repeal of HB 900 or SB 14. All of these are restricted in advance because of the targeted advertising restrictions. As we noted, the restrictions of section 52 require advanced parental consent before any targeted advertising can be sent in direct violation of Brown versus EMA. And the section involving section 55, which talks about restricting products that are legal but age restricted, also applies to the kinds of things that SEAT and appersent group want to engage in with minors across the state. Now, the state has maintained that section 55, targeted ads, only applies to illegal products, but that's not what the statute is talking about. The statute talks about legal but age restricted products. And that includes an entire range of things, that it can include voting, driving a car, operating a motorcycle, entering a contract, medical procedures, advertisements for contraceptives. All of those things are legal but age restricted, and this restricts them all. In addition to the restrictions on targeted advertising, we agree with the CCIA plaintiffs that the monitoring and filtering requirements also violate the First Amendment. As the district court found, these apply to 11 categories, very broadly defined categories, of speech that is not within the categories that are unprotected as to minors. And they are written very broadly. Despite the state's argument that these restrictions are narrowly defined, you can look at any of these categories and find that they don't fall within the unprotected categories. Restrictions on eating disorders, for example. Any online discussion of, say, dieting, or say someone has a website or a discussion in a social media forum dedicated to living a full or happy life with anorexia. Those restrictions in the filtering and monitoring sections would require the platforms to restrict them. Talking about suicide or self-harm, again, the state waves away. Discussions of literature like Romeo and Juliet are 13 reasons why, but all are captured within these categories that have to be filtered and advanced. Stalking, bulleting, or harassment, you could say that the song by the police, Every Step You Take, is an anthem to stalking. And yet, again, those sorts of artistic works are captured within these categories. Or substance abuse, advocacy of drug legalization would be captured within this, or talk about drug lyrics. I'm old enough to remember when the FCC wanted to crack down on rock music with drug lyrics, it released a list that included songs like Puff the Magic Dragon, Lucy in the Sky with Diamonds, or Steppenwolf's The Pusher. The fact that they fell within these categories were all restricted, and when you have these blanket categories in HB 18, they would be covered as well. Or take the category of grooming, the district court asked the question, what does it even mean to promote or facilitate grooming? All of these are very broadly arranged categories. And every aspect of HB 18 expands the extent to which state control is required. First of all, as I mentioned, the 11 categories are broad. They don't apply to categories that are necessarily outside First Amendment protection. Secondly, the verbs describing what kind of speech is captured in this expand these coverage areas, talking about facilitating, promoting, or glorifying. This is the opposite of the restriction in United States versus Williams, where the associated verbs describing what speech had to be restricted narrowed the scope of the statute. And in that case, narrowed it to actual transactions involving child pornography. Here, each of the operative verbs expands what is covered. So whether something is promoting, glorifying, or facilitating, it's really impossible to say. And for that reason, it covers the speech that we, the user plaintiffs, are concerned about. With my remaining time, let me just say a few words about the moody question. And as was mentioned, the question here is really quite different than it was in either Moody or in Fitch. And that's because there really isn't a question of whether or not this regulation is going to apply to Internet services writ large or things like Uber and Etsy and all of that. That was a question both in Moody and in Fitch. That simply doesn't apply here for the reasons that my colleague has explained. But beyond that, from the perspective of the users, regardless of which of the Internet services it applies to, all of the restrictions, regardless of which platforms are captured in this, all of those will restrict the speech of the users. And so the Moody step one analysis of which applications of the statute will affect speech, when you're talking about the effect on the users, the answer is 100%. The challenge in this case also, unlike in Moody, is focused entirely on the speech restricted provisions. Whether you're talking about 52D2, 55, or 53, all of them are the heartland of what Moody was talking about. And in this instance, those First Amendment problems exist in every application. I think my friend from the state, to a certain extent, is over reading Moody when he talks about the concurring opinions in Moody saying that a facial challenge for something like this is nearly impossible. First of all, that doesn't take into account the different factual setting of the challenge here versus in Moody. But second, I think they are misquoting a little bit, perhaps mischaracterizing Justice Barrett's statement when she said that a pre-enforcement facial injunction is a daunting, if not impossible, task. She was noting that that was specifically in the context of when you have a universal challenge to all of the restrictions that can be applied across the board to Internet services and not just the ones that target speech. And then she said, and this is the quote, dealing with a broad swath of varied platforms and functions in a facial challenge strikes me as a daunting, if not impossible, task. In that context, but not in this one. And here, where you have a challenge that is focused on the speech restricting provisions, and you have a challenge that goes to the users who are affected in every application of this law. Then I think you've solved the Moody problem. If the panel doesn't have any other questions, thank you for your attention. Thank you. Mr. Frazer, you've reserved five minutes. I thought I could dissuade my friends from saying the statute applies to Romeo and Juliet, but I didn't do a good enough job because they both said that. Preemption, Mr. Keller argues that Salesforce is a great case for them. Judge Douglas, you were on the Salesforce panel. Salesforce held that the law was not preempted. It's interesting because Salesforce said that preemption is a claims based analysis and that you look to the complaint. And I think that's because typically section 230 immunity or preemption comes up when a party is saying this is an affirmative defense to a claim like in MySpace or in Salesforce. And that's why the courts say, well, we're going to look to the nature of the claim the plaintiff is alleging. What is the duty they're alleging that the defendant has breached? And we're going to ask, are they effectively trying to hold the social media company liable for harms caused by third party speech? We have no complaint to look to here. There's no claims based analysis that the court can do because this is a trade association affirmatively invoking section 230 preemption in a pre-enforcement facial challenge. So it's not clear how the test maps on to this kind of claim, but I think you're absolutely right, Judge Ho. Is the statute treating the social media companies as publishers or speakers of third party content and holding them liable for any harm that it causes? The answer is no. Judge Oldham was persuasive on that point and that choice won. Mr. Keller referred to the- Preemption? Yeah, the scope of 230 and- Right, and I think what the question is, is the statute requiring compliance with the statutory provision that tells the social media companies to implement a strategy? Or is it holding them liable for harm caused by third party speech? And I think that it's the former. Mr. Keller mentioned the argument that the DSP definitions themselves are content based because they have a quote, news and sports exception. That is not what the statute says. In their brief, they say that it doesn't apply to news, sports, comma, and then they bracket in the word or commerce. That's not what it says. It says it doesn't apply to news, sports, commerce, or content that is primarily selected by the digital service provider. That makes perfect sense. The state legislature is not worried that the New York Times or the ESPN app is going to post content that glorifies child pornography. It understands that the risk is much higher on platforms where the users themselves publish the content. Mr. Keller referred to a wild under-inclusiveness problem. Justice Thomas rejected that in Free Speech Coalition. He said there's no freestanding under-inclusiveness standard and the state does not need to address every aspect of every problem when it wants to implement reasonable regulations. Lastly, Judge Ho, I agree with you with respect to targeted advertising. The Attorney General's position is that advertising is speech that proposes a commercial transaction. If you want to certify that question, I think that would be appropriate. I also think it's subject to a reasonable judicial narrowing. The Attorney General certainly does not interpret that to apply to things like public service announcements for vaccine campaigns. I think that's just another red herring. It's a hypothetical trying to distract the court, which Justice Scalia and Williams and Justice Barrett and Hanson said that plaintiffs can't do at the facial stage. If there's no other questions, we would ask that you reverse. Thank you. All right, thank you, counsel. The case is submitted and we're adjourned.